# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 20, 2025

## KEJUAN KING v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 17-02085  Carlyn L. Addison, Judge

_____

## No. W2024-01044-CCA-R3-PC

_____

Petitioner, Kejuan King, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his second degree murder conviction for which he received a sentence of twenty-five years' incarceration. Petitioner asserts that trial counsel was ineffective for failing to effectively cross-examine witnesses, investigate prior altercations and present evidence thereof, and argue for proper jury instructions. After review, we remand this case to the post-conviction court for entry of a written order that sufficiently addresses all grounds presented by Petitioner and states the court's findings of fact and conclusions of law regarding each ground as required by Tennessee Code Annotated section 40-30-111(b).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Case Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and TIMOTHY L. EASTER, J., joined.

John McNeil, Memphis, Tennessee, for the appellant, Kejuan King.

Jonathan Skrmetti, Attorney General and Reporter; Abigail. H. Hornsby, Assistant Attorney General; Steven J. Mulroy, District Attorney General; Monica Timmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Procedural History**

**A. Trial**

In January 2017, Petitioner shot and killed his sister's husband, Adarrell Anderson, at a gas station in Memphis, Tennessee. *State v. King*, No. W2020-01628-CCA-R3-CD, 2022 WL 363963, at \*1 (Tenn. Crim. App. Feb. 8, 2022). Petitioner was charged with second degree murder, and his case proceeded to trial in August 2018.

At trial, the State presented testimony from multiple witnesses that Petitioner shot the victim multiple times after the victim approached Petitioner as he was sitting in his vehicle. *See id.* at \*1-2. Julin Sanders, who arrived at the gas station with the victim, testified that the victim exited the car and stated that he wanted to talk with Petitioner. *Id.* at \*2. Mr. Sanders said that the victim had "just arrived" at Petitioner's vehicle when "shots rang out" and that the events occurred so quickly that "[i]t wasn't an altercation, couldn't have been no words or anything." *Id.* Following the shooting, a woman ran out of the store, got into Petitioner's vehicle on the driver's side, and drove away. *Id.*

Dr. Kevin Jenkins testified as an expert in forensic pathology and conducted the autopsy on the victim. *Id.* at \*3. He determined that the cause of death was multiple gunshot wounds and classified the manner of death as homicide. *Id.* Dr. Jenkins identified four distinct gunshot wounds: to the victim's head, torso, right hip, and lower abdomen. *Id.* One bullet entered the back left side of the victim's head, causing injuries that would have led to rapid death. *Id.* Another shot entered his upper back, damaging the left lung, ribs, and spine. *Id.* A third bullet struck his lower left abdomen, while the fourth entered at his right hip, traveling slightly left to right and downward without hitting any major organs. *Id.*

Nakia Moore testified on behalf of Petitioner. *Id.* at \*4. She said that she and Petitioner were romantically involved and had two young children who were in the vehicle during the shooting. *Id.* After she parked at a gas pump and went inside to pay, she heard gunfire and ran out to find Petitioner urging her to get back in the vehicle. *Id.* Fearing for their safety, she drove to South Memphis, where she and Petitioner stayed with his mother until she later spoke with police. *Id.* Ms. Moore also described the vehicle's condition, stating that the back doors were locked due to child safety features and the front driver's side door and window were broken. *Id.* To enter the vehicle, she had to reach through a slit in the plastic over the broken window. *Id.* The front passenger window was also broken and nonfunctional. *Id.*

Petitioner testified on his own behalf at trial. He said that after Ms. Moore went inside the gas station, he allowed their two-year-old daughter to sit in the driver's seat to play. *Id.* The child pointed out the victim by saying, "there go AJ, daddy," and appeared visibly unsettled. *Id.* Petitioner claimed he then saw the car door open and the victim standing over him. *Id.* According to Petitioner, the victim said, "Guess who it [is]," with "a grin" and "a snarl on his face" like he was ready to "bark." *Id.* Petitioner said that in response, he grabbed a gun from Ms. Moore's purse and fired several times until the victim "fell back." *Id.* at *5. He stated that he never exited the vehicle and that upon seeing Ms. Moore approaching, he urged her to "come on," fearing for their safety as he noticed Mr. Sanders walking toward their vehicle. *Id.*

Petitioner acknowledged telling police that after the victim said, "guess who," he saw the victim reach into his pocket, prompting him to lean back and fire. *Id.* He admitted he could not see what was in the victim's hand because the car door frame blocked his view. *Id.* Petitioner clarified that he was not afraid for his own safety. *Id.* Instead, he said his fear was for his two-year-old daughter, who was sitting in the front seat when the victim approached. *Id.*

Petitioner testified that on an attorney's advice, he waited five days to turn himself in to the police and ultimately met a police officer he knew at a Walmart on Riverdale. *Id.* He explained that he stayed hidden during that time because he had received threats and feared possible retaliation. *Id.*

The jury convicted Petitioner of second degree murder, and the trial court imposed a twenty-five-year sentence. *Id.* Thereafter, Petitioner filed a post-conviction petition alleging that trial counsel ("Counsel") was ineffective at trial and in failing to timely file a motion for new trial. On January 22, 2020, the post-conviction court entered an order granting Petitioner a delayed direct appeal and holding the post-conviction proceedings in abeyance until the completion of the direct appeal. This court subsequently affirmed Petitioner's conviction on direct appeal. *See id.* at *1. Petitioner did not file an application for permission to appeal to the Tennessee Supreme Court.

In June 2024, the post-conviction court held an evidentiary hearing on Petitioner's remaining post-conviction claims and subsequently entered an order denying Petitioner's petition. It is from this order that Petitioner now appeals. Following initial appellate briefing, this court observed that the same law firm represented Petitioner in his direct appeal and during the subsequent post-conviction proceedings and that the appellate record did not include a waiver by Petitioner of any potential conflict of interest. Accordingly, this court ordered that the parties submit supplemental briefing to address whether this representation during both the delayed direct appeal and the subsequent evidentiary hearing

in the post-conviction court constitutes a conflict of interest in accordance with our supreme court's holding in *Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010).

Through supplemental briefing, it was clarified that Petitioner knowingly waived any conflict of interest during a hearing held on April 12, 2024. At that hearing, the post-conviction court confirmed that Petitioner had discussed the potential conflict with his attorneys, understood that the post-conviction proceeding was the appropriate forum to raise claims of ineffective assistance against both trial and appellate counsel, and acknowledged that he would not be able to raise additional issues he believed should have been addressed on appeal. Petitioner also conceded that his counsel had previously informed him of his right to the appointment of new counsel. Thereafter, on June 27 and 28, 2025, the post-conviction court conducted an evidentiary hearing on Petitioner's claims that Counsel was ineffective, including that Counsel: 1) failed to properly cross-examine witnesses, including the State's medical examiner; 2) failed to investigate previous altercations between Petitioner and the victim and present evidence thereof; and 3) failed to ensure the jury was properly instructed on self-defense and flight.[1]

## B. Post-Conviction Hearing

Venetta Harnamji, Petitioner's mother, testified that the victim and her daughter Cheryl King had two children together. Ms. Harnamji testified about a series of incidents involving the victim and her family, most of which stemmed from the victim's relationship with Ms. King. She explained that for a time, she allowed the victim and Ms. King to live in her home while she lived elsewhere. During that period, the victim was involved in several domestic disputes in which Ms. King was the reported victim, as the two frequently fought. Ms. Harnamji recalled that the victim's first arrest occurred in November 2016, just months before the shooting. While Ms. King typically did not call the police when incidents occurred, others in the house often did. Although Petitioner witnessed several of these altercations, Ms. Harnamji stated she never personally saw any confrontation between Petitioner and the victim.

Ms. Harnamji described one specific incident where, following a fight between Ms. King and the victim, her older daughter, Montoya Trezevant, came to pick her up. As they were leaving, the victim fired at their vehicle and later shot at the house. Although Ms. Harnamji called the police, the victim was never arrested. She added that while Petitioner was not present during that particular event, "everyone knew what happened."

Ms. Harnamji testified that the victim and Petitioner were friends for a time, but their relationship deteriorated after Petitioner intervened in a fight between the victim and

---

[1] The petition raised additional claims not before this court on appeal.

Ms. King. Following that incident, the victim began making repeated threats against Petitioner. According to Ms. Harnamji, these threats were ongoing and included statements the victim made to Ms. King, such as that "whenever he see him, he don't care who was in the car, he was going to shoot." She claimed that the victim always carried a gun with him and that Petitioner would have known this. In response to these threats, Ms. Harnamji said she contacted the district attorney general's office in an effort to have the victim's bond revoked or to have him jailed, expressing her concern and desire to get the victim "off the street before he did anything to anybody."

Ms. Harnamji testified that on the day of the victim's death, that the Petitioner called her crying. She described him as "very emotional" and noted that he had to hand his cell phone to his girlfriend because he was too upset to speak clearly. After learning that the police had issued a warrant for the Petitioner's arrest, Ms. Harnamji told officers they could come to her home to take him into custody. She emphasized that the Petitioner did not attempt to flee or hide.

Ms. Harnamji testified that she hired Counsel to represent Petitioner on the murder charge. She stated that her family had a preexisting relationship with Counsel, who had been hired to handle "simple stuff" in the past. After hiring Counsel, Ms. Harnamji inquired whether he planned to hire a private investigator to acquire video footage from the Grizzly Mart. Counsel responded that the State had just provided discovery and that he needed more time to review the material. Ms. Harnamji also expressed her willingness to testify at the Petitioner's trial and stated that she was prepared to do so. She recalled that during the trial, Counsel instructed her to wait outside the courtroom in anticipation of being called as a witness. However, he ultimately did not call her to testify. Ms. Harnamji confirmed that, had she been called, her trial testimony would have been consistent with her testimony at the post-conviction hearing.

Counsel testified that he had been a licensed attorney for approximately thirty-four years at the time of the hearing and had tried approximately 150 to 200 jury trials. He stated that he had previously represented Petitioner's father in an earlier matter and had represented Petitioner in at least two prior cases. By his estimate, he had known the family for over twenty years. Counsel confirmed that he did not retain an investigator in the present case. While he acknowledged having hired investigators in other matters, he explained that he did not believe one was necessary here, as much of the testimony appeared to be contradictory and potentially unreliable. Instead, Counsel relied primarily on himself and a secretary who had worked with him for fourteen years in speaking with witnesses. Counsel indicated that in this case, he preferred speaking with witnesses himself, including Ms. Harnamji and Ms. King, rather than obtaining information from a third-party investigator.

Counsel explained that given the facts of the case, Petitioner could not argue that someone else shot the victim. He further noted that many of the potential defense witnesses could have been readily impeached by the State or would have offered testimony that was inadmissible hearsay. For example, Counsel stated that if he had called Ms. King to testify, "the State would have said, well, you told the police this, and now you're telling them that." He also pointed out that Ms. King had previously given a statement to police indicating that Petitioner had threatened to kill the victim the day before the incident. Counsel believed that if this statement had been admitted, "the case would have been over," as it suggested a motive for Petitioner to kill the victim. Counsel acknowledged that, during Petitioner's testimony, the State asked whether he had made such a threat in Ms. King's presence. Nevertheless, Counsel believed that by that point, the case centered more on the issue of self-defense, and he was certain that Petitioner had denied making the threat.

Counsel testified that similarly, much of Ms. Harnamji's testimony concerning prior altercations between Petitioner and the victim was inadmissible hearsay, as she was generally not present during those events. Counsel expressed that he "was of two minds whether to put her on." He explained that he was not trying to keep her out of the courtroom, but rather he was waiting to "see if I could use her in a way that wouldn't backfire on us." Counsel stated that Ms. Harnamji is a "strong individual with a lot of character . . . if she went off on a certain route, she'd get chopped up by the prosecution." Counsel was concerned that her testimony might appear overly motivated by a desire to protect her son, which could distract the jury from the defense's primary argument—that the victim was a "scary individual" and that Petitioner "did what he had to do for himself and for his children and get out of there as quickly as he could."

Ultimately, Counsel explained that he chose not to raise the issue of prior altercations between Petitioner and the victim as a matter of trial strategy. He was concerned about drawing hearsay objections and did not want to appear to be "maligning the deceased" in front of the jury. Counsel noted that he did attempt to obtain a Tennessee Rule of Evidence 404(b) hearing during trial to address the admissibility of this evidence, but the trial court denied his request. When asked why he did not pursue an offer of proof, Counsel responded that, in light of the court's prior ruling, he did not believe doing so would get them "very far." Instead, his focus remained on ensuring that the jury followed the defense's theory—that Petitioner reacted to the victim approaching his door while his two children were inside, and that Petitioner was simply trying to remove himself from a dangerous situation. Counsel also explained that he deliberately avoided filing a pretrial motion on the issue, as doing so could have revealed his theory of the case, resulted in an adverse ruling, and ultimately undermined his strategic advantage at trial.

Counsel testified that during his investigation, he was looking for a witness who could support the theory that "somebody came and took" a potential weapon or other item

the victim may have been carrying after the shooting but before the police arrived. However, he noted that he had "been told that version" of events in many of his previous criminal cases. Counsel also confirmed that no surveillance footage of the incident was available, as the equipment was not functioning at the time. In reflecting on the difficulty of finding witnesses to bolster Petitioner's story, Counsel remarked:

> So who's going to come forward and say anything when they know the people who are involved? They know [the victim's] propensity for violence. They know he's a gang member. They know all these things, which of course the jury don't know, and nobody wants them to know. And you have to steer clear of that. This case was like treading through a minefield.

Regarding the medical examiner who conducted the victim's autopsy, Counsel recalled performing a thorough cross-examination. He noted that the medical examiner was "relatively new" to the Medical Examiner's Office and was not "particularly experienced." Counsel stated that he was able to effectively impeach the examiner on the failure to test the recovered bullet fragments. He argued that this omission demonstrated the investigation's lack of thoroughness, as the examiner's office was unable to determine who had fired the weapon, how many shots were fired, how many entered the victim's body, and from which angle or direction. Although Counsel considered retaining a defense forensics expert, he ultimately decided against it, concluding that it was better not to "emphasiz[e] things that would probably be left better unsaid." In any event, Petitioner had already admitted to shooting the victim, and the central issue at trial was why the shooting occurred.

Counsel testified that he requested a self-defense jury instruction at the close of proof, but the trial court denied the request, citing a lack of evidence of any prior altercation. Counsel acknowledged, "we clearly failed to get the point across to [the court] about" the victim's prior altercations. He attributed this failure to his inability to present a witness whose testimony would not be easily impeached by the State. When asked if he objected to the court issuing a flight instruction, Counsel stated that he believed he did, noting that Petitioner had a strong motive to remove himself and children from potential harm.

At the post-conviction hearing, Petitioner testified on his own behalf. He recalled receiving a plea offer of twenty years to plead guilty as charged just two days before trial. Petitioner claimed that, prior to trial, he never had the opportunity to fully explain to Counsel the strained history between himself and the victim. Petitioner testified that he and the victim once had a good relationship and had lived together for a period of time. However, their relationship began to deteriorate a few months before the shooting. Petitioner explained that the tension started when he intervened in a fight between the

victim and his sister, Ms. King. A few days later, when the victim returned to the house and initiated another altercation with Ms. King, Petitioner again stepped in. This time, the victim responded by returning to the house armed with a gun.

Petitioner testified that approximately two months before the shooting, he was at the home of a friend, D.C., when the victim arrived with several other individuals, apparently attempting to confront Petitioner. According to Petitioner, D.C. refused to let them in, nearly resulting in an altercation between D.C. and the victim. Petitioner claimed the victim spat in D.C.'s face and threatened to shoot into the house before the police were called, causing the victim to leave. In another incident, Petitioner claimed that the victim fired shots at Petitioner's sisters, Ms. Trezevant and Ms. King, as they were leaving the victim's mother's residence. He further claimed that later that same day, the victim also fired shots at Petitioner's mother's house. Petitioner clarified that he was not living in Memphis at the time of this event, which he stated occurred approximately a year and a half before Petitioner shot the victim.

Petitioner testified that the last time he saw the victim in person was two weeks after Thanksgiving in 2016. While returning home from the gas station, he noticed that the victim and another individual were following him home. Petitioner stated that after arriving home and exiting his vehicle, the victim also got out of his car, holding a gun but saying nothing. Petitioner went inside his house, interpreting the encounter as an act of intimidation. He further testified that, to his knowledge, the victim generally carried a firearm.

When asked why he did not testify to any of the prior incidents at trial, Petitioner explained that Counsel advised doing so "wouldn't be a good look" and "wouldn't go good on our behalf." Petitioner affirmed that, at the time of the shooting, he believed that the victim wanted to harm him.

Regarding the day of the shooting, Petitioner testified that he was sitting in the passenger seat of his vehicle while his daughter played in the driver's seat. Petitioner was first alerted to the victim's presence when his daughter said, "There go [the victim]." Petitioner stated that he turned around to find the car door wide open and the victim standing there. According to Petitioner, he saw the victim reaching for something, at which point Petitioner fired his gun. He testified that he was in fear for his life when he shot the victim, but emphasized that his primary concern was the safety of his children, who were in the car with him. As he explained, "It wasn't about me . . . my kids [were] in the car, so they came before me, and I did my best to, you know, shield them from that."

## C.  Post-Conviction Court's Findings

On July 23, 2024, the post-conviction court entered an order denying the petition for post-conviction relief.  In its order, the court appears to make a finding of fact and a conclusion of law as to one claim—why Counsel did not call certain witnesses, including Ms. King and Ms. Harnamji, at trial.  The court's order references Counsel's testimony that his failure to call these witnesses was a strategic decision because the witnesses had "limited credibility" and a "high possibility of impeachment by the State."  The court's order further reflects it believed Counsel's testimony that the witnesses' testimony would have been hearsay and there was danger in attacking the deceased victim's character.  As to the other claims, the court made the following finding: "Petitioner did not provide any sufficient proof relating to any of the other grounds that were alleged in his petition relating to illegal jury instructions, testing fingerprints, or counsel's failure to properly investigate." The order does not provide any further analysis of Petitioner's claims.

Petitioner's timely appeal follows.

## II.  Analysis

On appeal, Petitioner asserts that Counsel was ineffective for: 1) failing to properly cross-examine witnesses, including the State's medical examiner; 2) failing to investigate previous altercations between Petitioner and the victim and present evidence thereof; and 3) failing to ensure the jury was properly instructed on self-defense and flight.  Petitioner further asserts that the post-conviction court failed to address whether Counsel's performance was deficient and, if so, whether that deficiency resulted in prejudice.  The State responds that Petitioner has not established either deficient performance or prejudice and is therefore not entitled to relief.

The post-conviction court's order lacks sufficient findings of fact and conclusions of law to permit meaningful appellate review of the denial of Petitioner's remaining claims. Tennessee Code Annotated section 40-30-111(b) requires:

> Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and *shall state the findings of fact and conclusions of law with regard to each ground* (emphasis added).

*See also* Tenn. R. Sup. Ct. 28 § (9)(A) (stating that orders granting or denying post-conviction petitions are to "contain specific findings of fact and conclusions of law relating to each issue presented").  This statutory duty is mandatory, as emphasized in multiple

recent cases, including *Tate v. State*, 679 S.W.3d 631, 632 (2023), where the Tennessee Supreme Court reiterated that the post-conviction court must include specific findings of fact and conclusions of law in its final order. *See also Boyd v. State*, No. W2023-01669-CCA-R3-PC, 2025 WL 433002, at *1-2 (Tenn. Crim. App. Feb. 7, 2025), *perm. app. filed* (Tenn. June 4, 2025). Additionally,

> A mere recitation or summary of the testimony of the witnesses at a hearing is not a "finding of fact" as is required. [*Steven Tyler Nabi v. State*, No. M2017-00041-CCA-R3-PC, 2018 WL 1721869 at *5 (Tenn. Crim. App., April 9, 2018) (reversing where the record is devoid of factual findings by the post-conviction court pertinent to issues raised on appeal)]. A "finding of fact" is the post-conviction court's opportunity to fulfill its responsibility to sort through all the evidence and set forth what actually happened, as opposed to just each witness's version of what happened. *See Charles Bradford Stewart v. State*, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *14 (Tenn. Crim. App., June 20, 2017) (post-conviction court's order explicitly sets out the factual findings and conclusions of law in an enumerated list).

*Cole v. State*, No. W2020-01607-CCA-R3-PC, 2022 WL 1040006, at *7 (Tenn. Crim. App. Apr. 7, 2022). The distinction between the two is critical because appellate courts afford deference to findings of fact but not to summaries of evidence. *See Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009) (citing Tenn. R. App. P. 13(d); *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)).

Here, the post-conviction court's order includes only a brief summary of the evidence presented at the hearing and fails to make specific findings regarding the credibility, weight, or value of that evidence. It likewise fails to apply those factual findings to the relevant legal standards in order to resolve each of Petitioner's claims. Rather than making clear credibility determinations, the court's view of the evidence can only be inferred from its denial of the petition. The court's judgment should reflect a reasoned analysis of its findings of fact. For example, where Petitioner claims that counsel was ineffective for failing to investigate prior altercations and present evidence thereof, the court should identify and compare the relevant testimony—such as Counsel's explanation for the chosen trial strategy and Petitioner's contrary account—make explicit credibility determinations, and then analyze whether the performance was deficient and, if so, whether it prejudiced the outcome. In remanding, we agree with this court's reasoning in *Robinson v. State*:

> Because ineffective assistance of counsel is a single ground for relief, and because if the Petitioner were to be granted relief based upon his ineffective

- 10 -

assistance allegations, he would receive a new trial, we decline to piecemeal these proceedings and, accordingly, believe a complete remand to be in order.

No. W2020-00942-CCA-R3-PC, 2021 WL 3642399, at *6 (Tenn. Crim. App. Aug. 18, 2021) (citation omitted).

The post-conviction court is in the best position to make such determinations and analyses. It is able to see and hear the witnesses, and decide what evidence supports or defeats a petitioner's claims. Under Code section 40-30-111(b), the post-conviction's court's written order must contain its findings of facts and conclusions of law.

## III. Conclusion

For the reasons set forth above, the case is hereby remanded to the post-conviction court for entry of an order that sufficiently addresses all grounds presented by Petitioner, and which states the court's findings of fact and conclusions of law regarding each ground as required by Code section 40-30-111(b). A new evidentiary hearing is not necessary. We will not consider Petitioner's remaining claims at this time. If the parties deem it necessary, they may submit further briefing with this court after the post-conviction court submits a written order that complies with the statute.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE